UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JUAN PINEDA, on behalf of himself and all others similarly situated

                           Plaintiff,

            v.

BIG CITY REALTY MANAGEMENT, LLC, CFF CONSULTING INC., 3427 BROADWAY BCR, LLC, 3440 BROADWAY BCR, LLC, 3660 BROADWAY BCR, LLC, 633 WEST 152 BCR, LLC, 605 WEST 151 BCR, LLC, 545 EDGECOMBE BCR, LLC, 535-539 WEST 155 BCR, LLC, 408-412 PINEAPPLE, LLC, 106-108 CONVENT BCR, LLC, 510-512 YELLOW APPLE, LLC, 513 YELLOW APPLE, LLC, 145 PINEAPPLE LLC, 2363 ACP PINAPPLE, LLC, 580 ST. NICHOLAS BCR, LLC, 603-607 WEST 139 BCR, LLC, 559 WEST 156 BCR, LLC, 3750 BROADWAY BCR, LLC, KOBI ZAMIR, and FERNANDO ALFONSO,

                          Defendants.
----------------------------------------------------------------X

Case No. 22-cv-05428(BMC)

**PLAINTIFF JUAN PINEDA'S DECLARATION IN SUPPORT
OF HIS MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE
OF CIVIL PROCEDURE 23**

      I, Juan Pineda, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury the following:

      1.    I am the named Plaintiff in the above-captioned case and I submit this declaration in support of my Motion for Class Certification pursuant to Federal Rule of Civil Procedure ("FRCP" or "Rule") 23.

      2.    I worked for Defendants from on or about November 1, 2021 through July 29, 2022 as a superintendent at two apartment buildings located at 3440 Broadway and 3427 Broadway in Manhattan (the "Buildings").

3. I interviewed with and was hired by Defendant Fernando Alfonso ("Mr. Alfonso"), who was my supervisor throughout my employment at the Buildings. I understood Mr. Alfonso to be the manager of buildings owned by Kobi Zamir. I understood Mr. Zamir to be the owner of the Buildings, and other apartment buildings.

4. Shortly before I started working at the Buildings, Mr. Alfonso provided me with two letters, both dated November 1, 2021 (collectively, the "Letters"). One of the letters was on the letterhead of 3440 Broadway BCR LLC, which I understood to be Mr. Zamir's corporation that owned 3440 Broadway. The other letter was on the letterhead of 3427 Broadway BCR LLC, which I understood to be Mr. Zamir's corporation that owned 3427 Broadway. True and actual copies of the Letters are collectively attached hereto as **Exhibit A**.

5. The Letters set forth some of the initial terms and conditions of my employment. Among other provisions, both of the Letters stated that my wages of $20.00 per hour would be paid to me "on a bi-weekly basis."

6. From the commencement of my employment through March 20, 2022, I was paid bi-weekly. During this period, I never received my paychecks within seven days after the end of the first week of each pay period.

7. At the end of each pay period, I would receive two separate wage statements, one from 3440 Broadway BCR LLC, and the other from 3427 Broadway BCR LLC.

8. I would receive these pay statements, together with two paychecks (one from 3440 Broadway BCR, LLC, and the other from 3427 Broadway BCR LLC) five days after the last day of each two-week pay period.

9. For example, the wage statements (one from 3440 Broadway BCR, LLC and the other from 3427 Broadway BCR LLC) for the pay period beginning March 7, 2022 ending

March 20, 2022, are attached hereto as **Exhibit B**. They state that my pay date (the date when I actually received my wages) was March 25, 2022.

10. The Letters and wage statements may create the misimpression that I had two different jobs. In practice, I observed that the Buildings were run as a single enterprise, with Mr. Alfonso, my supervisor, as the managing agent, and Mr. Zamir, who I understood to be the owner, regularly stopping by the Buildings.

11. I apportioned the time I spent at each Building based on the particular tasks that needed to be completed during the day, which varied each day.

12. Nearly all of my job responsibilities involved manual labor tasks to maintain and repair the Buildings, including cleaning; mopping; making repairs; changing locks; plastering; light electrical work; cleaning sidewalks; light plumbing; painting; managing recycling and garbage collection; removing and replacing kitchen cabinets; and other tasks relating to maintaining and repairing the Buildings. Tenants were provided my cell phone number to reach me for repair requests and in the event of emergencies.

13. Throughout my employment with Defendants, I worked a regular schedule of approximately forty-eight hours to fifty hours per week, typically as follows: Monday through Friday, from approximately 8:00 a.m. until 4:00 p.m. or later; Saturdays, from approximately 8:00 a.m. to 12:00 p.m.; and Sundays, beginning at approximately 8:00 a.m. to 12:00 p.m.

14. In addition to my regular schedule, Mr. Alfonso told me that I was required to be on-call during all hours of the week, so as to be available to address emergency issues as they arose. For example, due to the age of the Buildings' boilers, I had to remain on-call to handle heating issues, which regularly arose at night. Mr. Alfonso regularly contacted me with work requests until 9:00 p.m.

15. Mr. Alfonso required that I be available at all times to handle emergency issues.

16. I never received overtime compensation of one and one-half times my hourly rate of pay. I was paid my regular hourly rate of pay for the overtime hours Defendants permitted me to report on my timesheets. Until March 21, 2022, I was permitted to report between eight and ten hours of overtime, for which I received my regular pay rate of $20.00. Beginning March 21, 2022, Mr. Alfonso told me not to report overtime work on timesheets.

17. Mr. Alfonso provided me with specific instructions for filling out timesheets. When I first began in November 2021, he filled out timesheets for me – one for 3440 Broadway, and the other for 3427 Broadway. He instructed me that going forward, I was to submit replicas of these, always equally apportioning the hours worked per day between 3440 Broadway and 3427 Broadway (arbitrarily, morning hours at 3427 Broadway, and afternoon hours at 3440 Broadway).

18. By way of example, true and actual copies of the timesheets for the pay period ending January 9, 2022 (the "1/9/22 Timesheets"), are collectively attached hereto as **Exhibit C**.

19. In practice, the apportionment of my time between the Buildings on any given day varied based on the tasks at hand. Nobody asked me to keep track of the amount of time I spent a particular building.

20. Until March 21, 2022, I received $20.00 per hour regardless of how many overtime hours I worked. For example, the 1/9/22 Timesheets show that I worked forty-eight (48) hours during each of the two workweeks in that period. For each of these two weeks, pursuant to Mr. Alfonso's instructions, I reported working twenty-four hours at 3427 Broadway, and twenty-four hours at 3440 Broadway.

21. A true and correct copy of my two wage statements for the two-week pay period ending January 9, 2022 is attached hereto as **Exhibit D**.

22. Beginning March 21, 2022, Mr. Alfonso changed how much, and how often, I was paid. I was instructed to stop working weekends, and not to report any weekend work hours. But, as Mr. Alfonso was aware, I had no choice other than to prepare garbage and recycling and handle other tasks on weekends. As a result, I received no pay for these hours. Also, my pay periods were changed from bi-weekly to weekly. These changes are reflected in the timesheets for the pay period March 21, 2022 to March 27, 2022, which are attached hereto as **Exhibit E**.

23. Until I received my paycheck for the week ending March 27, 2022, I was unaware that Mr. Alfonso had also reduced my hourly pay from $20.00 to $16.25. When I complained, Mr. Alfonso explained that the pay reductions were being applied to all superintendents.

24. I declare under penalty of perjury, that the foregoing is true and correct.

Dated: New York, New York
      April __, 2023

                                                        _____
                                                            JUAN PINEDA



The Spanish Group LLC
1 Park Plaza, Suite 600
Irvine, CA 92614
Estados Unidos de América
https://www.thespanishgroup.org

## Traducción Certificada

Proporcionado el **9 de abril de 2023**

Yo, Alexander Largaespada ( *Alex Largaespada* ), por medio de la presente certifico que traduje el presente documento de español a inglés o de inglés a español y que es una traducción correcta y fiel. Además, certifico que soy competente en la traducción tanto de español como de inglés, y que soy capaz de producir y certificar la validez de dicha traducción. Este documento no se ha traducido para un familiar, amigo o socio comercial.

Yo, Salvador G. Ordorica, como Agente de Control de Calidad de The Spanish Group LLC, doy fe de que la persona mencionada es un traductor o traductora competente de español a inglés y de inglés a español. Por lo tanto, como representante autorizado de The Spanish Group, certifico que este documento se ha corregido y que el siguiente documento es una traducción correcta y fiel de su original.

Respetuosamente,

*[signature]*

**Salvador G. Ordorica**
**The Spanish Group LLC**
(ATA #267262)



*The Spanish Group LLC confirma las credenciales y/o la competencia de sus traductores y del presente certificado, y cualquier página adjunta sirve para afirmar que el o los documentos enumerados arriba han sido traducidos tan fielmente como ha sido posible de acuerdo a sus originales. The Spanish Group LLC no da fe de que los documentos originales sean correctos, legítimos o que no hayan sido falsificados. Al haber aceptado los términos y condiciones necesarios para contratar los servicios de The Spanish Group LLC y/o al presentar este certificado, el cliente desiste, renuncia, se abstiene y declina el derecho de presentar cualquier reclamación o demanda en contra de The Spanish Group LLC. Por consiguiente, The Spanish Group LLC no puede ser considerado responsable por cualquier pérdida o daño sufrido por el o los clientes o cualquier otra parte, ya sea durante, después o que surja del uso de los servicios de The Spanish Group LLC.*

TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO ESTE DE NUEVA YORK
-----------------------------------------------------------------X
JUAN PINEDA, en su nombre y en el de todos los demás
en situación similar                                          Caso Núm. 22-cv-05428(BMC)

                              Demandante,

                    v.

BIG CITY REALTY MANAGEMENT, LLC, CFF CONSULTING INC., 3427 BROADWAY BCR, LLC, 3440 BROADWAY BCR, LLC, 3660 BROADWAY BCR, LLC, 633 WEST 152 BCR, LLC, 605 WEST 151 BCR, LLC, 545 EDGECOMBE BCR, LLC, 535-539 WEST 155 BCR, LLC, 408-412 PINEAPPLE, LLC, 106-108 CONVENT BCR, LLC, 510-512 YELLOW APPLE, LLC, 513 YELLOW APPLE, LLC, 145 PINEAPPLE LLC, 2363 ACP PINAPPLE, LLC, 580 ST. NICHOLAS BCR, LLC, 603-607 WEST 139 BCR, LLC, 559 WEST 156 BCR, LLC, 3750 BROADWAY BCR, LLC, KOBI ZAMIR, y FERNANDO ALFONSO,

                              Demandados.
-----------------------------------------------------------------X

### DECLARACIÓN DEL DEMANDANTE JUAN PINEDA EN APOYO DE SU MOCIÓN PARA LA CERTIFICACIÓN DE CLASE DE CONFORMIDAD CON LA REGLA FEDERAL DE PROCEDIMIENTO CIVIL 23

       Yo, Juan Pineda, de conformidad con 28 U.S.C. § 1746, declaro bajo pena de perjurio lo siguiente:

       1.     Soy el Demandante nombrado en el caso arriba mencionado y presento esta declaración en apoyo de mi Petición de Certificación de Clase de conformidad con la Regla Federal de Procedimiento Civil ("FRCP" o "Regla") 23.

       2.     Trabajé para los Demandados desde el 1 de noviembre de 2021 o alrededor de esa fecha hasta el 29 de julio de 2022 como responsable de mantenimiento en dos edificios de apartamentos ubicados en 3440 Broadway y 3427 Broadway en Manhattan (los "Edificios").

3. El demandado Fernando Alfonso ("Sr. Alfonso") me entrevistó y contrató, quien fue mi supervisor durante todo mi empleo en los Edificios. Entendí que el Sr. Alfonso era el administrador de los edificios propiedad de Kobi Zamir. Entendí que el Sr. Zamir era el propietario de los edificios y de otros edificios de apartamentos.

4. Poco antes de empezar a trabajar en los Edificios, el Sr. Alfonso me proporcionó dos cartas, ambas fechadas el 1 de noviembre de 2021 (colectivamente, las "Cartas"). Una de las cartas llevaba el membrete de 3440 Broadway BCR LLC, que entendí que era la sociedad del Sr. Zamir, propietaria de 3440 Broadway. La otra carta llevaba el membrete de 3427 Broadway BCR LLC, que entendí que era la sociedad del Sr. Zamir propietaria de 3427 Broadway. Se adjuntan copias auténticas y reales de las cartas como **Anexo A**.

5. Las cartas establecían algunos de los términos y condiciones iniciales de mi empleo. Entre otras disposiciones, ambas Cartas establecían que mi salario de $20,00 por hora se me pagaría "quincenalmente".

6. Desde el comienzo de mi empleo hasta el 20 de marzo de 2022, se me pagó quincenalmente. Durante este período, nunca recibí mis cheques de pago dentro de los siete días posteriores al final de la primera semana de cada período de pago.

7. Al final de cada período de pago, recibiría dos declaraciones de salarios separadas, una de 3440 Broadway BCR LLC, y la otra de 3427 Broadway BCR LLC.

8. Recibiría estos recibos de nómina, junto con dos cheques de pago (uno de 3440 Broadway BCR, LLC, y el otro de 3427 Broadway BCR LLC) cinco días después del último día de cada período de pago de dos semanas.

9. Por ejemplo, las declaraciones de salarios (una de 3440 Broadway BCR, LLC y la otra de 3427 Broadway BCR LLC) para el período de pago que comienza el 7 de marzo de 2022

y termina el 20 de marzo de 2022, se adjuntan a la presente como **Anexo B.** En ellas se indica que mi fecha de pago (la fecha en que realmente recibí mis salarios) fue el 25 de marzo de 2022.

10. Las Cartas y las declaraciones de salarios pueden crear la impresión errónea de que yo tenía dos trabajos diferentes. En la práctica, observé que los Edificios se gestionaban como una sola empresa, con el Sr. Alfonso, mi supervisor, como agente gestor, y el Sr. Zamir, que entendí que era el propietario, pasando regularmente por los Edificios.

11. Repartí el tiempo que pasaba en cada edificio en función de las tareas concretas que tenía que realizar durante el día, las cuales, variaban a diario.

12. Casi todas las responsabilidades de mi trabajo consistían en realizar tareas manuales para mantener y reparar los edificios, como limpiar, trapear, hacer reparaciones, cambiar cerraduras, enyesar, trabajos ligeros de electricidad, limpiar aceras, trabajos ligeros de fontanería, pintar, gestionar el reciclaje y la recogida de basuras, quitar y poner armarios de cocina y otras tareas relacionadas con el mantenimiento y la reparación de los Edificios. Los inquilinos disponían de mi número de teléfono móvil para ponerse en contacto conmigo en caso de reparación o emergencia.

13. A lo largo de mi empleo con los Demandados, trabajé un horario regular de aproximadamente cuarenta y ocho horas a cincuenta horas por semana, normalmente de la siguiente manera: de lunes a viernes, desde aproximadamente las 8:00 a. m. hasta las 4:00 p. m. o más tarde; los sábados, desde aproximadamente las 8:00 a. m. hasta las 12:00 p. m.; y los domingos, desde aproximadamente las 8:00 a. m. hasta las 12:00 p. m.

14. Además de mi horario habitual, el Sr. Alfonso me dijo que tenía que estar de guardia durante todas las horas de la semana, para poder atender los problemas de emergencia que surgieran. Por ejemplo, debido a la antigüedad de las calderas de los edificios, tenía que

3

permanecer de guardia para solucionar los problemas de calefacción, que solían surgir por la noche. El Sr. Alfonso me contactaba para pedirme algún servicio hasta las nueve de la noche.

15. El Sr. Alfonso me exigió que estuviera disponible en todo momento para atender asuntos de emergencia.

16. Nunca recibí una compensación por horas extras de una y una hora y media mi salario por hora. Se me pagó mi salario regular por hora por las horas extras que los Demandados me permitieron reportar en mis hojas de asistencia. Hasta el 21 de marzo de 2022, se me permitió reportar entre ocho y diez horas extras, por las cuales recibí mi tarifa regular de pago de $20,00. A partir del 21 de marzo de 2022, el Sr. Alfonso me dijo que no reportara las horas extras en las hojas de asistencia.

17. El Sr. Alfonso me dio instrucciones específicas para rellenar las hojas de asistencia. Cuando empecé en noviembre de 2021, él rellenó hojas de horas para mí, una para el 3440 Broadway y otra para el 3427 Broadway. Me indicó que, en adelante, debía presentar réplicas de estas, siempre repartiendo equitativamente las horas trabajadas al día entre el 3440 Broadway y el 3427 Broadway (arbitrariamente, las horas de la mañana en el 3427 Broadway y las de la tarde en el 3440 Broadway).

18. A modo de ejemplo, se adjuntan en conjunto copias auténticas y reales de las hojas de asistencia correspondientes al período de pago que finalizó el 9 de enero de 2022 (las "Hojas de asistencia de 9/1/22"), como **Anexo C.**

19. En la práctica, la distribución de mi tiempo entre los Edificios en un día determinado variaba en función de las tareas que tenía pendientes. Nadie me pidió que llevara la cuenta del tiempo que dedicaba a un edificio concreto.

4

Case 1:22-cv-05428-BMC   Document 44   Filed 04/14/23   Page 11 of 11 PageID #: 167

20.     Hasta el 21 de marzo de 2022, recibí $20,00 por hora sin importar cuántas horas extras trabajé. Por ejemplo, las Hojas de asistencia del 9/1/22 muestran que trabajé cuarenta y ocho (48) horas durante cada una de las dos semanas laborales de ese período. Para cada una de estas dos semanas, de conformidad con las instrucciones del Sr. Alfonso, declaré haber trabajado veinticuatro horas en el 3427 Broadway y veinticuatro horas en el 3440 Broadway.

21.     Una copia fiel y correcta de mis dos declaraciones de salarios para el período de pago de dos semanas que terminó el 9 de enero de 2022 se adjunta a la presente como **Anexo D**.

22.     A partir del 21 de marzo de 2022, el Sr. Alfonso cambió cuánto y con qué frecuencia se me pagaba. Se me ordenó que dejara de trabajar los fines de semana y que no declarara ninguna hora de trabajo en fin de semana. Pero, como el Sr. Alfonso sabía, yo no tenía otra opción que preparar la basura y el reciclaje y ocuparme de otras tareas los fines de semana. Como resultado, no recibí ningún pago por estas horas. Además, mis periodos de pago pasaron de ser quincenales a semanales. Estos cambios se reflejan en las Hojas de asistencia correspondientes al período de pago del 21 de marzo de 2022 al 27 de marzo de 2022, que se adjuntan a la presente como **Anexo E**.

23.     Hasta que recibí mi cheque de pago correspondiente a la semana que finalizó el 27 de marzo de 2022, no sabía que el Sr. Alfonso también había reducido mi salario por hora de $20,00 a $16,25. Cuando me quejé, el Sr. Alfonso me explicó que las reducciones salariales se estaban aplicando a todos los responsables de mantenimiento.

23.     Declaro bajo pena de perjurio que lo que antecede es cierto y correcto.

Fecha: Nueva York, Nueva York
    10 de abril de 2023

_____
JUAN PINEDA

5